Argued and submitted January 12, decision of Court of Appeals reversed; judgment of conviction affirmed and sentence vacated; case remanded to circuit court for further proceedings August 18, 2005

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## ZACHARY JAMES HARRIS,
*Petitioner on Review.*

(CC C011903CR; CA A117718; SC S51600)

118 P3d 236

Andrew D. Coit, Portland, argued the cause and filed the briefs for petitioner on review.

Rolf C. Moan, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

CARSON, C. J.

## CARSON, C. J.

This case involves the use of prior juvenile delinquency adjudications to increase sentences for adult felony convictions under the Oregon Felony Sentencing Guidelines (guidelines). Under the guidelines, prior juvenile adjudications for person felonies,[1] like prior adult criminal convictions, increase a convicted defendant's criminal history score, which, in turn, usually operates to increase the convicted defendant's sentence. Unlike adult criminal trials, however, juvenile delinquency proceedings in Oregon are conducted without a jury.

■ On review, defendant first argues generally that, because juvenile adjudications in Oregon are accomplished without jury trials, *any* subsequent reliance upon those adjudications to increase a defendant's criminal sentence violates the jury trial guarantee of the Sixth Amendment to the United States Constitution.[2] Alternatively, defendant argues that, in any event, the trial court unconstitutionally used the fact of his past juvenile record to impose an increased criminal sentence in his particular case. Defendant's first argument is not well-taken. As to his second argument, however, we hold that, under *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000), the manner in which the trial court used defendant's juvenile adjudication to increase his sentence amounted to an error that violated the Sixth Amendment. As a result, we vacate defendant's sentence and remand this case for resentencing.

---

[1] The Oregon Criminal Justice Commission maintains a list of statutory offenses that it expressly has defined under its administrative rules as "person felonies." The crimes identified as such range from aggravated murder, ORS 163.095, to boating hit and run, ORS 830.475(2). All appear to be offenses that, in some form, involve violent or dangerous acts directed against the person of another.

[2] The Sixth Amendment provides, in part:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation[.]"

The Sixth Amendment right to a jury trial is applicable to the states through the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Duncan v. Louisiana*, 391 US 145, 88 S Ct 1444, 20 L Ed 2d 491 (1968).

The facts are undisputed. In 2002, defendant was indicted on 17 criminal counts in connection with a string of Washington County burglaries that occurred in 2001. In exchange for the prosecution's agreement to drop most of the charges against him, defendant agreed to plead guilty to three counts of first-degree theft, two counts of first-degree burglary, and one count of identify theft. Defendant's plea petition expressly called for open sentencing; no sentencing stipulations had been made as part of defendant's agreement to plead guilty. Among other things, the plea petition also required defendant to list his past criminal convictions and juvenile adjudications. Defendant reported that, as a 12-year-old juvenile, he had been adjudicated for first-degree rape. He had no prior adult convictions.

The trial court accepted defendant's guilty plea and later held a sentencing hearing. At that hearing, defendant relied upon the United States Supreme Court's decision in *Apprendi*, 530 US 466, to argue that using his prior juvenile adjudication to enhance his adult criminal sentence would violate the Sixth Amendment, as well as Article I, section 11, of the Oregon Constitution.[3] In *Apprendi*, the Supreme Court had concluded that it was "unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *Id.* at 490. In so holding, however, the Court also held that the existence of any prior convictions was a fact exempt from that general rule. *Id.* Building from that foundation, defendant in the present case argued that *Apprendi*'s prior conviction exception rested upon the fact that such convictions were established through procedures satisfying the constitutional guarantees of fair notice, proof beyond a reasonable doubt, and trial by jury before being used as sentence enhancements. Defendant pointed out that, in contrast, case law interpreting both the state and federal constitutions had made clear that jury trials were not constitutionally required in delinquency proceedings and,

---

[3] Article I, section 11, of the Oregon Constitution provides, in part:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury in the county in which the offense shall have been committed; to be heard by himself and counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof[.]"

consequently, were not made available to juvenile offenders tried in Oregon's juvenile courts. Because his prior juvenile adjudication had lacked a jury trial, defendant argued that, unlike the fact of a prior conviction, the fact of his adjudication could not be used to increase his sentence and at the same time remain consonant with *Apprendi*. In arguing that point to the trial court, defendant's lawyer added:

> "I think the State could have avoided those problems by pleading and proving prior conviction possibly, but it's not my job to build my client's criminal history or to put the State in a position where they can enhance his sentence based upon a prior criminal history."

Ultimately, the trial court rejected defendant's arguments and relied upon defendant's prior juvenile adjudication to increase his criminal history score and to impose an upward departure sentence under the guidelines. For the two first-degree burglary convictions, the trial court imposed respectively a 24-month and a 34-month term of incarceration, which it ordered to be served consecutively. On the remaining counts, the trial court imposed aggregated sentences totaling 36 months, all of which were to be served concurrently with the burglary sentences. Apart from credit for time served and the good-time credit that could accrue during his second burglary sentence, the trial court deemed defendant ineligible for sentence reduction, work release, alternative incarceration, and conditional or supervised release programs. The Court of Appeals affirmed defendant's sentence without written opinion. *State v. Harris*, 192 Or App 602, 89 P3d 96 (2004). This court subsequently allowed defendant's petition for review to consider his constitutional arguments.

On review, defendant challenges his upward departure sentence solely based upon the United States Constitution. His primary assertion is that, because jury trial safeguards are not available in Oregon juvenile proceedings, *any* use of a prior juvenile adjudication to lengthen a subsequent criminal sentence in Oregon violates the jury trial right set out in the Sixth Amendment. Defendant reasons that, after *Apprendi*, use of juvenile adjudications to increase adult sentences without essentially reproving the offenses underlying

those adjudications violates the Sixth Amendment because the resulting sentence is based upon facts that were not offered or proved to a jury. Defendant's position appears to be that using a juvenile adjudication as a factor to increase adult sentences is unconstitutional whenever the juvenile proceedings that produce those adjudications are conducted without jury trial protections. As a secondary argument, defendant contends that, in any event, the trial court unconstitutionally applied defendant's prior juvenile adjudication as a sentencing factor in this particular case.

In response, the state argues that, presently, nothing in the United States Supreme Court's jurisprudence interpreting the Sixth Amendment can be read as expressly prohibiting the use of juvenile adjudications at sentencing. In any event, the state continues, the facts of this case fall into either one of the two expressed exceptions to *Apprendi*'s general rule.

First, the state argues that, by acknowledging the existence of his prior juvenile adjudication in his plea petition, defendant essentially admitted that fact and placed it beyond the reach of the general rule recognized in *Apprendi*. Alternatively, the state contends that prior juvenile adjudications easily fit within *Apprendi*'s prior conviction exception. Pointing to the Supreme Court's decision in *Almendarez-Torres v. United States*, 523 US 224, 118 S Ct 1219, 140 L Ed 2d 350 (1998), the state contends that *Apprendi*'s prior conviction exception should be viewed as a broad "recidivism" exception. According to the state, the application of such an exception does not depend upon the role that juries play in the processes that eventually lead courts to label repeat offenders "recidivists." Instead, the state argues, application of the "recidivism" exception depends upon whether the prior proceedings in question were conducted with the "substantial procedural safeguards" that the Sixth Amendment requires. Because the Sixth Amendment does not require jury trials in juvenile court proceedings, *see McKeiver v. Pennsylvania*, 403 US 528, 91 S Ct 1976, 29 L Ed 2d 647 (1971) (so stating), and because juvenile adjudications are accompanied by a number of other important constitutional safeguards, the state now asserts that

using defendant's prior juvenile adjudication as a sentencing factor for his adult convictions does not offend the Sixth Amendment. Finally, the state argues that, under *Apprendi*, it should be allowed to prove the existence of defendant's juvenile adjudication to a jury on remand.

The state is correct in its initial observation that the Supreme Court has yet to address this specific issue. The parties' arguments, however, implicate an element of criminal sentencing that has received substantial scrutiny from the Supreme Court over the last ten years, that is, sentence enhancement and the factors that justify it. Because an understanding of that background is important to the resolution of this case, we review the relevant history as a prelude to our discussion.

In 1994, the Supreme Court placed prior convictions squarely within what was, at the time, a largely unlimited pool of information from which sentencing courts could draw in the course of fashioning criminal punishments. In *Nichols v. United States*, 511 US 738, 747, 114 S Ct 1921, 128 L Ed 2d 745 (1994), the Court stated:

> "As a general proposition, a sentencing judge 'may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.' *United States v. Tucker*, 404 US 443, 446, 30 L Ed 2d 592, 92 S Ct 589 (1972). 'Traditionally, sentencing judges have considered a wide variety of factors in addition to evidence bearing on guilt in determining what sentence to impose on a convicted defendant.' *Wisconsin v. Mitchell*, 508 US 476, 485, 124 L Ed 2d 436, 113 S Ct 2194 (1993). *One such important factor, as recognized by state recidivism statutes and the criminal history component of the Sentencing Guidelines, is a defendant's prior convictions.*"

(Emphasis added.)

Four years later, in *Almendarez-Torres*, 523 US 224, the Supreme Court rejected the notion that prior convictions were among the substantive elements of a federal statute that criminalized reentry of previously deported aliens into the United States. As a result, the Court also rejected the

defendant's contention that the Fifth Amendment[4] required the government to charge the existence of the defendant's prior convictions in his indictment.

In *Almendarez-Torres*, the Court examined 8 USC section 1326, a federal statute that made it a crime for deported aliens to return to the United States without special permission. Aliens convicted under the statute with no prior criminal history could receive a maximum sentence of two years. 523 US at 226. By contrast, aliens who illegally returned to the United States following conviction and deportation for an aggravated felony could receive a 20-year maximum sentence. *Id.* The question before the Court was whether such convictions were an element of an aggravated crime under the federal statute and, therefore, required charging by indictment, or whether Congress had intended the references to prior convictions in the statute to be viewed simply as sentencing factors.

Drawing on the text of the statute, as well as its legislative history, a majority of the Court concluded that the statute was not susceptible to any interpretation that could call its constitutionality into question. That conclusion flowed, in part, from the Court's view that the defendant's prior convictions fell within the broad category of "recidivism":

> "At the outset, we note that the relevant statutory subject matter is recidivism. That subject matter—prior commission of a serious crime—is as typical a sentencing factor as one might imagine. Perhaps reflecting this fact, the lower courts have almost uniformly interpreted statutes (that authorize higher sentences for recidivists) as setting forth sentencing factors, not as creating new crimes (at least where the conduct, in the absence of the recidivism, is independently unlawful). And we have found no statute that clearly makes recidivism an offense element in such circumstances."

---

[4] The Fifth Amendment provides, in part:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger[.]"

*Id.* at 230 (internal citations omitted). Ultimately, the Court rejected the notion that the defendant's prior convictions must be treated as an element of his substantive criminal offense under 8 USC section 1326.

Faced with a similar statute two years later, the Supreme Court reached a different conclusion in *Jones v. United States*, 526 US 227, 119 S Ct 1215, 143 L Ed 2d 311 (1999). In *Jones*, the Court was called upon to analyze 18 USC section 2119, a federal carjacking statute. Under that statute, a person taking a motor vehicle from another at gunpoint faced a maximum sentence of 15 years. If a carjacking victim suffered serious bodily injury during commission of the crime, the maximum prison sentence rose to 25 years; if the victim died, the maximum sentence became life imprisonment. The issue before the Court was again whether the factors that lengthened prison terms under the statute were indeed sentencing factors, or whether they were elements of separate offenses that the state was required to charge by indictment, prove beyond a reasonable doubt, and submit to a jury for a verdict. *Id.* at 229.

In concluding that the statutory elements in question should not be construed as sentencing factors, the Court's analysis drew heavily upon the historical importance of the jury trial in early English and American jurisprudence. The Court's core concern was that, if the elements at issue in *Jones* were interpreted merely as sentencing factors, then those elements arguably would be placed beyond a jury's purview, creating the possibility of a direct clash with the jury trial guarantee of the Sixth Amendment.

Pointing to the historical antecedents of the Sixth Amendment, the Court wrote that, under English common law, prior to the American Revolution,

"[t]he potential or inevitable severity of sentences was indirectly checked by juries' assertions of a mitigating power when the circumstances of a prosecution pointed to political abuse of the criminal process or endowed a criminal conviction with particularly sanguinary consequences. This power to thwart Parliament and Crown took the form not only of flat-out acquittals in the face of guilt but of what today we would call verdicts of guilty to lesser included

offenses, manifestations of what Blackstone described as 'pious perjury' on the jurors' part."

*Id.* at 245. The Court explained that, as competition between juries and the judiciary grew, the government introduced countervailing measures to diminish juries' power, including the parliamentary practice of barring the right to a jury trial when defining new, statutory offenses. *Id.* Among such laws that the framers experienced firsthand were the Stamp Act and other statutes regulating American trade with England. Those enactments eventually would lead to the protest set out in the Declaration of Independence against England's deprivation of jury trials in the colonies. *Id.* at 245-46. Having reviewed that history, the Court explained its importance to the case at hand:

> "In sum, there is reason to suppose that in the present circumstances, however peculiar their details to our time and place, the relative diminution of the jury's significance would merit Sixth Amendment concern. It is not, of course, that anyone today would claim that every fact with a bearing on sentencing must be found by a jury; we have resolved that general issue and have no intention of questioning its resolution. *The point is simply that diminishment of the jury's significance by removing control over facts determining a statutory sentencing range would resonate with the claims of earlier controversies, to raise a genuine Sixth Amendment issue not yet settled.*"

*Id.* at 248 (emphasis added). The Court went on to hold that viewing the elements of the carjacking statute as sentencing factors "would raise serious constitutional questions on which precedent is not dispositive." *Id.* at 251. To avoid an interpretation of the statute that arguably could be construed as unconstitutional, the Court concluded that the federal carjacking statute at issue must be viewed as establishing three separate offenses, each marked by distinct elements that required charging by indictment, proof beyond a reasonable doubt, and a jury determination of guilt.

In reaching that conclusion in *Jones*, the Court described, in a footnote, the motivating force behind its concern over a contrary interpretation of the carjacking statute:

"[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."

*Id.* at 243 n 6. The Court went on to concede that, "[b]ecause our prior cases suggest rather than establish this principle, our concern about the Government's reading of the statute rises only to the level of doubt, not certainty." *Id.* The following year, however, that "suggestion" would become an established tenet of Sixth Amendment jurisprudence in *Apprendi*.

In *Apprendi*, the Supreme Court examined a New Jersey hate crime statute that allowed trial courts to impose extended prison terms in criminal cases if a court found that the crimes at issue had been committed "with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." 530 US at 469. The defendant in *Apprendi* had fired several shots into the home of an African-American family that recently had moved into an all-white New Jersey neighborhood. After being arrested and admitting that he was the shooter, the defendant told police interrogators that he did not personally know his intended victims, but objected to their presence in the neighborhood because of their race. *Id.*

The defendant subsequently pleaded guilty to second-degree possession of a firearm for an unlawful purpose in connection with the shooting incident. The offense carried a penalty range of five to 10 years. The trial court, however, sentenced the defendant to 12 years' imprisonment after concluding that, under New Jersey's "hate crime" statute, the evidence supported a finding of racial bias on the defendant's part. *Id.* at 471.

In reversing the trial court's judgment, the Supreme Court expressly confirmed what it only had suggested previously in *Jones*:

*"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved*

*beyond a reasonable doubt.* With that exception, we endorse the statement of the rule set forth in the concurring opinions in [*Jones*]: '[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.' "

*Id.* at 490 (emphasis added). Ultimately, the Court concluded that the challenged sentencing scheme at issue before it represented "an unacceptable departure from the jury tradition that is an indispensable part of our criminal justice system." *Id.* at 497.

Since issuing *Apprendi*, the Supreme Court has reaffirmed its commitment to the principles set forth in *that case* in several subsequent decisions, including *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004). In *Blakely*, the defendant had pleaded guilty to second-degree kidnapping involving domestic violence and use of a firearm. 124 S Ct at 2534-35. In the State of Washington, crimes of that nature were classified generally as Class B felonies, punishable by no more than 10 years in prison. *Id.* For the specific crimes at issue in *Blakely*, other provisions of state law further limited the maximum available sentence to 53 months. The trial court nevertheless sentenced the defendant to a 90-month prison term after finding that the defendant had acted with deliberate cruelty, an expressed ground for upward sentencing departures under Washington's domestic violence statutes. *Id.* at 2535.

In defending that enhanced sentence before the Supreme Court, the State of Washington argued that its 10-year sentencing ceiling for Class B felonies was the relevant "statutory maximum" for the defendant's crimes. Because the defendant's 90-month sentence was well within that range, the state asserted that the requirements of *Apprendi* had been satisfied.

The Supreme Court, however, rejected the state's argument, explaining:

"The State nevertheless contends that there was no *Apprendi* violation because the relevant 'statutory maximum' is not 53 months, but the 10-year maximum for class

B felonies [under Washington state law]. It observes that no exceptional sentence may exceed that limit. Our precedents make clear, however, that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings."

*Id.* at 2537 (emphasis in original; internal citations omitted). The Court went on to reverse the judgment below and remand the case for further proceedings consonant with *Apprendi*. *Id.* at 2543.[5] In doing so, the Court noted that its adherence to *Apprendi* was motivated, in part, by its desire to give concrete meaning to the jury trial right provided by the Sixth Amendment:

"Our commitment to *Apprendi* in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial. That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. *Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary. Apprendi carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict.* Without that restriction, the jury would not exercise the control that the Framers intended."

*Id.* at 2538-39 (internal citations omitted; emphasis added).

■ From the preceding examination of cases spanning *Nichols* to *Blakely*,[6] several propositions emerge regarding the current relationship between sentencing models and the

[5] This court has since come to apply the rationale used by the Supreme Court in *Blakely* to sentencing matters in Oregon. *See State v. Dilts*, 337 Or 645, 103 P3d 95 (2004) (under Sixth Amendment, defendant has right to have additional facts that may increase his or her sentence beyond otherwise applicable maximum sentence decided by jury, rather than by trial judge).

[6] Since the time that the parties first briefed this case for argument, the Supreme Court has decided other *Apprendi*-related matters in *United States v. Booker*, 543 US 220, 125 S Ct 738, 160 L Ed 2d 621 (2005). *Booker* dealt with the Federal Sentencing Guidelines and has no application here.

Sixth Amendment. First, in a post-*Apprendi/Blakely* world, the broad, largely unlimited inquiry that sentencing courts could undertake at the time of *Nichols* is diminished when that inquiry is aimed at lengthening sentences beyond their "statutory maximums" as the Supreme Court defined that phrase in *Apprendi* and *Blakely*. In such cases, although a sentencing court still may consider all the facts available to it under *Nichols*, that ability is now circumscribed by the requirement that, aside from a defendant's prior convictions or admissions, any fact that increases a sentence first must be proved to a jury beyond a reasonable doubt. Second, prior convictions remain, at least for now, a viable exception to the requirement noted above, due in large part to the jury's function in establishing those convictions.[7] Finally, the jury's importance in establishing the general validity of convictions under the Sixth Amendment is founded upon more than the relatively narrow function of the jury as a reliable factfinder. From the framers' perspective, the jury was also meant to serve as the people's check on judicial power at the trial court level. With those ideas in mind, we now turn to the issue before us, that is, whether the trial court properly considered defendant's prior juvenile adjudication in increasing his sentence in this case.

■       The essence of defendant's primary argument reduces to this: Because juvenile adjudications are conducted without juries, they cannot be used to enhance adult criminal sentences unless, and until, the facts giving rise to those

---

[7] Justice Thomas recently has called into question the continuing validity of the prior conviction exception articulated in *Almendarez-Torres v. United States*, 523 US 224, 118 S Ct 1219, 140 L Ed 2d 350 (1998). In *Shepard v. United States*, 544 US 13, 125 S Ct 1254, 161 L Ed 2d 205 (2005), Justice Thomas wrote:

"*Amendarez-Torres*, like *Taylor* [*v. United States*, 495 US 575, 110 S Ct 2143, 109 L Ed 2d 607 (1990)], has been eroded by this Court's subsequent Sixth Amendment jurisprudence, and a majority of the Court now recognizes that *Almendarez-Torres* was wrongly decided. The parties do not request it here, but in an appropriate case, this Court should consider *Almendarez-Torres*' continuing viability."

125 S Ct at 1264 (Thomas, J., concurring).

Justice Thomas's concurring opinion on the matter, however, is presently not binding authority on this court, and we will not attempt to guess whether a majority of the Supreme Court may, at some future date, ultimately adopt Justice Thomas's view. Until that time, we must assume that *Almendarez-Torres*, along with the prior conviction exception, remains good law.

adjudications are presented to a jury and relitigated. As explained below, however, that proposition is not well-taken as a matter of Sixth Amendment jurisprudence.

■     The Sixth Amendment has little to say, generally, about what elements a legislature permissibly may use to define a crime or lengthen a criminal sentence. Although the legislature cannot define a crime in a way that relieves the state of its constitutional obligations to prove each element of the offense beyond a reasonable doubt, defining criminal conduct is still a task generally left to the legislative branch. *Harris v. United States*, 536 US 545, 557, 122 S Ct 2406, 153 L Ed 2d 524 (2002). The Sixth Amendment, by comparison, is focused on procedures that guarantee criminal defendants, among other things, "the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, * * * and to be informed of the nature and cause of the accusation[.]" US Const, Amend VI. In that regard, it is of no moment—at least for Sixth Amendment purposes—if the legislature chooses to designate, *inter alia*, a prior nonjury juvenile adjudication as an element that increases the seriousness of a crime or lengthens a criminal sentence, so long as the *existence* of that prior adjudication is proved to a jury,[8] or such a requirement is knowingly waived.[9]

---

[8] Of course, as discussed earlier, the Sixth Amendment would not require proof of the existence of such an adjudication to a jury if that adjudication qualifies as a prior conviction. We address that question in the text below.

[9] Using prior nonjury determinations in such a fashion is not uncommon in our criminal justice system today. The crime of criminal driving while suspended, ORS 811.182, for example, is a case study in how the legislature typically uses prior nonjury, noncriminal convictions to form a substantive element of a larger criminal charge. The foundation of criminal driving while suspended rests on repeated traffic violations, charges expressly exempt from jury trials under ORS 152.076(1). If a driver is convicted of 20 traffic violations in a five-year period, then the license of the driver is required to be revoked as a habitual offender under ORS 809.600(2)(b). The administrative revocation proceedings that follow pursuant to ORS 809.640 are also juryless. If the administrative process results in a determination that the driver is indeed a habitual offender, that finding will raise any subsequent conviction for driving while suspended—normally a Class A traffic violation—to the level of a criminal misdemeanor, ORS 811.182(4)(f). Under defendant's theory in this case, if the state sought to prove criminal driving while suspended because a driver was still on the road after having lost his driver license as a habitual offender, then the state would be forced to relitigate all the prior juryless decisions that had led to the habitual offender determination to establish a key element of the more serious crime.

■     However, the Supreme Court's decisions in *Apprendi* and *Blakely* lend defendant's secondary argument—that is, that the trial court erred in using defendant's juvenile adjudication to enhance his sentence in this case—considerably more traction than his first. Read together, *Apprendi* and *Blakely* stand for the proposition that, outside of prior convictions or facts admitted by a criminal defendant, *any* fact that increases a criminal sentence beyond its statutory maximum must be proved to a jury to be consonant with the Sixth Amendment. In this case, it is beyond dispute that defendant's prior juvenile adjudication qualified as "any fact" and that the state did not present evidence of that juvenile adjudication to a jury at defendant's adult sentencing hearing. It also is beyond dispute that the trial court used defendant's juvenile adjudication specifically to lengthen his prison sentence beyond the maximum that he otherwise could have received. The remaining question is whether the use of defendant's juvenile adjudication in this case fits within either of the two exceptions in *Apprendi,* discussed above. We turn to that inquiry now.

■ ■     As noted, the state seeks to mitigate the effect of *Apprendi* and *Blakely* upon the facts here by attempting to square defendant's sentence with the exceptions contained in those cases. First, the state essentially argues that, because defendant noted his prior juvenile rape adjudication in filling out his plea petition, its existence became a fact "admitted by the defendant." *Blakely*, 124 S Ct at 2537. That argument, however, fails to grasp fully the nature of judicial admissions.[10] This court has defined judicial admissions as statements "made by a party or his [or her] attorney *for the purpose of dispensing with proof of a fact in issue.*" *Foxton v. Woodmansee*, 236 Or 271, 278, 386 P2d 659 (1963), *reh'g den*, 236 Or 271, 388 P2d 275 (1964) (emphasis added). To purposely dispense with the proof of such a fact, however, a party must at least know that the fact is indeed one that is at issue

---

[10] The Oregon Evidence Code often uses the term "admissions" in a context that is different from that framing the discussion above. *See, e.g.*, OEC 613 (inadmissability of extrinsic evidence in some instances concerning prior inconsistent statements does not apply to "admissions of a party-opponent" as defined in ORS 40.450). Our discussion of judicial admissions in this case does not effect the settled understanding of admissions in the evidentiary context.

and must be proved. As a result, this court has also categorized judicial admissions as an intentional *"act of waiver, relating to the opponent's proof of the fact,* and not merely a statement of assertion or concession, made for some independent purpose." *Erwin v. Thomas,* 267 Or 311, 313, 516 P2d 1279 (1973) (quoting 9 Wigmore, Evidence, § 2594, 596 (3d ed)) (emphasis added). A guilty plea ordinarily constitutes such a waiver with regard to the jury trial right. *Brady v. United States,* 397 US 742, 748, 90 S Ct 1463, 25 L Ed 2d 747 (1970). To be valid, however, such a waiver must show "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 US 458, 464, 58 S Ct 1019, 82 L Ed 1461 (1938).

In this case, defendant clearly waived his right to have a jury decide the charges as to which he ultimately was convicted; defendant pleaded guilty to a reduced number of charges in return for the prosecution's promise to dismiss the remaining criminal counts. That bargain, however, did not encompass any aspect of defendant's prospective sentence. Defendant went on to participate in a proceeding clearly identified in his plea petition as "open" sentencing, *i.e.,* no sentencing agreements had been reached between the parties prior to the sentencing proceedings, and both defendant and the prosecution were entitled to present evidence in support of their respective positions regarding upward or downward departure sentences. Thus, although defendant's plea petition required him to report any past juvenile adjudications, nothing in the record demonstrates that the statements that defendant made in his guilty plea also were made "for the purpose of dispensing with proof of a fact in issue" at sentencing. *Foxton,* 236 Or at 278. Indeed, defendant expressly objected to the use of his prior juvenile adjudication at his sentencing hearing. As a result, we cannot say, based upon the record before us, that defendant's acknowledgment of a prior juvenile adjudication in filling out his guilty plea amounted to either an admission or a knowing waiver of his jury trial right for sentencing purposes.

■ The state also argues that, in any event, prior juvenile adjudications easily fit within *Apprendi*'s prior conviction exception. According to the state, *Apprendi*'s exception for prior convictions should be read as a broad "recidivism"

exception intended to encompass repeat offenders generally, without regard to how the determinations of the recidivist's past offenses have been labeled or conducted. When viewed in that light, the state contends, application of the prior conviction exception is not contingent upon whether the right to a jury trial was strictly observed in a prior proceeding. Instead, the state argues that the exception turns upon whether the prior proceeding afforded the criminal defendant substantial procedural safeguards. As a result, the state urges us to adopt the rationale employed by the Eighth Circuit Court of Appeals in *United States v. Smalley*, 294 F3d 1030 (8th Cir 2002), *cert den*, 537 US 1114.

In *Smalley*, the Eighth Circuit opined that "whether juvenile adjudications should be exempted from *Apprendi*'s general rule should not turn on the narrow parsing of words, but on an examination of whether juvenile adjudications, like adult convictions, are so reliable that due process of law is not offended by such an exemption." *Id.* at 1033. Ultimately, the Eight Circuit concluded that, because juvenile proceedings are safeguarded by the rights of notice, counsel, and confrontation, the privilege against self-incrimination, and application of proof beyond a reasonable doubt, the adjudications that result are reliable enough to satisfy the exception in *Apprendi. Id.*

Under Oregon statutes, juvenile adjudications are not considered criminal convictions. *See* ORS 419C.400(4) (juvenile court adjudication "is not a conviction of a crime or offense"). We agree with the state that how a legislative body chooses to label or not label those determinations is not necessarily dispositive here. When the circumstances suit them, different jurisdictions can, and frequently do, define juvenile adjudications and criminal convictions as sharing the same meaning. *See, e.g.*, 18 USC § 521(a) (under federal statute aimed at curbing criminal street gangs, "conviction" includes finding that person has "committed an act of juvenile delinquency involving a violent or controlled substances felony").

We also agree with the state that the procedural protections accompanying juvenile adjudications imbue them with a high degree of reliability. The Supreme Court, however, has made clear that reliability is not the *sine qua non* of

the Sixth Amendment; that constitutional provision also serves to divide authority between judge and jury. As the Court explained in *Blakely*, the framer's paradigm for criminal justice was

"Not the civil-law ideal of administrative perfections, but the common-law ideal of limited state power accomplished by strict division of authority between judge and jury. As *Apprendi* held, every defendant has the *right* to insist that the prosecutor prove to a jury all facts legally essential to the punishment."

124 S Ct at 2543 (emphasis in original). Both *Smalley* and the state fail to acknowledge those important constitutional points. We therefore find the Eighth Circuit's rationale in *Smalley* to be unpersuasive and decline to adopt it as our own.

In sum, we hold that the use of prior juvenile adjudications as sentencing factors in Oregon does not violate the jury trial right guaranteed by the Sixth Amendment. At the same time, we also hold that the Sixth Amendment requires that when such an adjudication is offered as an enhancement factor to increase a criminal sentence, its existence must either be proved to a trier of fact or be admitted by a defendant for sentencing purposes following an informed and knowing waiver. Here, neither of those conditions was met. It follows that the trial court's use of defendant's juvenile adjudication as an enhancement factor at sentencing violated the Sixth Amendment.

The decision of the Court of Appeals is reversed. The judgment of conviction is affirmed, and the sentence is vacated. The case is remanded to the circuit court for further proceedings.