STATE of Minnesota, Respondent,

v.

Richard McFEE, Appellant.

No. A05–283.

Supreme Court of Minnesota.

Sept. 21, 2006.

Benjamin J. Butler, Asst. State Public Defender, Minneapolis, MN, for appellant.

Mike Hatch, Atty. General, Susan Gaertner, Ramsey County Atty., Mitchell L. Rothman, Asst. County Atty., St. Paul, MN, for respondents.

## OPINION

GILDEA, Justice.

The question presented in this case is whether, consistent with United States Supreme Court precedent, juvenile adjudications can be used in calculating a defendant's criminal history score when the fact of those adjudications has been determined by a judge, not a jury. The Supreme Court has said that, " '[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' " *Blakely v. Washington*, 542 U.S. 296, 301, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)). The court of appeals held that juvenile adjudications were properly included in a defendant's criminal history score when determined by a judge. We affirm.

Richard Angelo McFee pleaded guilty to one count of making terroristic threats in violation of Minn.Stat. § 609.713, subd. 1 (2004). The charge arose from McFee's threats to kill N.M., N.M.'s baby, and anyone residing in N.M.'s home. N.M. reported the threats to Maplewood police on June 6, 2004, and McFee was subsequently arrested and charged.[1]

The Ramsey County District Court accepted McFee's plea and ordered a presentence investigation (PSI). The PSI determined that McFee had six criminal history points, consisting of three felony points, one misdemeanor/gross misdemeanor point, one custody-status point, and one point for prior juvenile adjudications. The point attributed to the juvenile adjudications was based on McFee's adjudication as delinquent in three separate matters.[2]

Following completion of the PSI, the district court conducted a sentencing hearing. McFee claimed at the hearing that his Sixth Amendment right to trial by jury was violated by the use of a custody-status point and his prior juvenile record in calculating his criminal history score. McFee moved to amend the sentencing worksheet to exclude the custody-status point and the juvenile point from his criminal history score because those determinations did not arise from a jury trial. Following a continuance for briefing, the district court denied McFee's motion.

Using a criminal history score of six, the district court sentenced McFee to 30 months in prison, the presumptive sentence for someone with six criminal history points who commits a severity level IV crime, such as terroristic threats. The

court of appeals affirmed and we granted McFee's petition for review.[3]

■ McFee contends that judicial fact finding that he was adjudicated delinquent violates his Sixth Amendment right as defined in *Apprendi* and refined in *Blakely*. The state contends that calculations of criminal history scores do not fall within the *Apprendi/Blakely* rule. We employ a de novo standard of review when interpreting the constitution. *State v. Shattuck*, 704 N.W.2d 131, 135 (Minn.2005).

## I.

■ The *Apprendi/Blakely* rule requires that facts used to increase a defendant's sentence beyond the statutory maximum provided for the offense must be found by a jury or admitted by the defendant. *Blakely*, 542 U.S. at 301, 303, 124 S.Ct. 2531. Prior convictions are a well-recognized exception to the rule. *See id.* at 301, 124 S.Ct. 2531. McFee claims that juvenile adjudications do not fall within this exception. Because the scope of the prior conviction exception is the issue presented in this case, we turn first to the development of the exception.

The prior conviction exception was first recognized in *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998).[4] The defendant

1. McFee was also charged with sale of marijuana in the fifth degree in a separate incident from October 7, 2003, and a jury found him guilty of that offense. McFee's appeal does not involve this charge.

2. The parties agreed that the juvenile adjudications were not extended juvenile jurisdiction (EJJ) cases, and thus were not subject to a jury trial right. *See* Minn.Stat. § 260B.130, subd. 3 (2004) (providing jury trial right to juveniles who are subject to EJJ prosecution).

3. Subsequent to the filing of McFee's petition, we decided *State v. Allen*, 706 N.W.2d 40 (Minn.2005). In *Allen* we held that a judicial

determination of the assignment of a custody-status point is constitutional. *Id.* at 48. McFee concedes that *Allen* is dispositive of the question he raised about his custody-status point. We hold that the district court did not violate McFee's Sixth Amendment jury trial right in assigning the custody-status point to McFee.

4. McFee argues that with the change in the composition of the Supreme Court the prior conviction exception will fall. *See also Shepard v. United States*, 544 U.S. 13, 27, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (Thomas, J., concurring) ("[A] majority of the Court now recognizes that *Almendarez–Torres* was

in *Almendarez–Torres* was charged under a federal statute, 8 U.S.C. § 1326 (1988), that made it a crime for "any alien" to return to the United States after deportation. *Almendarez–Torres*, 523 U.S. at 226, 118 S.Ct. 1219. The statute further provided that if the defendant had been deported subsequent to a conviction for commission of an aggravated felony, the defendant could be sentenced to up to 20 years in prison. *Id.* The defendant in *Almendarez–Torres* pleaded guilty, and at sentencing argued that he was not subject to the 20–year maximum because his indictment did not allege that he had been deported for commission of an aggravated felony. *Id.* at 227, 118 S.Ct. 1219.

The issue before the Court in *Almendarez–Torres* was whether the deportation based on the aggravated felony provision in the statute "defines a separate crime or simply authorizes an enhanced penalty." *Id.* at 226, 118 S.Ct. 1219. If the prior aggravated felony conviction was an element of the crime, it would have had to have been charged in the indictment (and proven beyond a reasonable doubt to the jury at trial). *Id.* The Court held that the fact of the prior aggravated felony conviction was a sentencing enhancement and not an element of the crime. *Id.* at 235, 118 S.Ct. 1219. The Court based this conclusion on its determination "that the relevant statutory subject matter is recidivism. That subject matter—prior commission of a serious crime—is as typical a sentencing factor as one might imagine." *Id.* at 230, 118 S.Ct. 1219; *see also id.* at 243, 118 S.Ct. 1219 ("[T]he sentencing factor at issue here—recidivism—is a traditional, if not the most traditional, basis for

a sentencing court's increasing an offender's sentence."); *id.* at 244, 118 S.Ct. 1219 ("[R]ecidivism 'does not relate to the commission of the offense * * *.' ").[5]

In *Jones v. United States*, the Court referred to the "repeated emphasis on the distinctive significance of recidivism" in *Almendarez–Torres*. 526 U.S. 227, 249, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). Such emphasis "leaves no question that the Court regarded [recidivism] as potentially distinguishable for constitutional purposes from other facts that might extend the range of possible sentencing." *Id.* As "one basis" for this distinction, the Court noted that "unlike virtually any other consideration used to enlarge the possible penalty for an offense, * * * a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees." *Id.*

In *Apprendi v. New Jersey*, the Court determined that it "need not revisit" *Almendarez–Torres*, characterizing it as "a narrow exception to the general rule" the Court laid out in *Apprendi*. 530 U.S. at 490, 120 S.Ct. 2348. The *Apprendi* Court held that the Sixth Amendment to the United States Constitution requires that "[o] ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* (emphasis added). The Court also noted that "the due process and Sixth Amendment concerns otherwise implicated in allowing a judge to determine a 'fact' increasing punishment beyond the maximum

---

wrongly decided."). As we have previously noted, however, " 'the Supreme Court should retain the exclusive privilege of overruling its own decisions.' " *Minnesota Twins P'ship v. State*, 592 N.W.2d 847, 856 (Minn.1999) (citation omitted).

**5.** We described the exception as "the recidivism exception" in *State v. Henderson*, 706 N.W.2d 758, 761 (Minn.2005).

of the statutory range" were "mitigated" in *Almendarez–Torres* because "procedural safeguards attached to any 'fact' of prior conviction," and because the defendant in that case did not contest the accuracy of the "fact" of his prior convictions. *Apprendi*, 530 U.S. at 488, 120 S.Ct. 2348.

In *Blakely v. Washington*, the Court did not directly address the prior conviction exception to the *Apprendi* rule. The Court simply noted that the case before it "require[d][it] to apply the rule * * * expressed in [*Apprendi* ]." *Blakely*, 542 U.S. at 301, 124 S.Ct. 2531.

Since *Blakely* we have had occasion to interpret and apply the prior conviction exception in three cases. In *Allen* we held that a jury was not constitutionally required to find the fact of a defendant's probationary status. 706 N.W.2d at 48. We based our holding on our "belie[f] that the fact a defendant is on probation at the time of the current offense arises from, and is so essentially analogous to, the fact of a prior conviction, that constitutional considerations do not require it to be determined by a jury." *Id.* In addition, we noted that "[l]ike the fact or character of a prior conviction, a defendant's custody status can be determined by reviewing court records relating to that conviction." *Id.*

We also examined the prior conviction exception in *State v. Leake*, where we noted that, "after *Blakely*, the prior conviction exception recognized in *Apprendi* retains vitality and it is constitutional for a defendant's sentence to be increased based on a prior conviction without submitting the fact of the conviction to the jury." 699 N.W.2d 312, 323 (Minn.2005).

Finally, we examined the prior conviction exception in *State v. Henderson*, 706 N.W.2d 758 (Minn.2005). In that case we examined sentencing under Minnesota's career offender statute, Minn.Stat. § 609.1095, subd. 4 (2004), and the question was whether this statute's provision requiring a finding that the current offense "was committed as part of a pattern of criminal conduct" was subject to judicial fact finding. *Henderson*, 706 N.W.2d at 760. We held that the statute required more than simply verifying the fact of prior convictions. *Id.* at 762. In addition to the fact of the convictions, a qualitative analysis was required to satisfy the "pattern" component of the statute. *Id.* Because this type of analysis was necessary, we held that the prior conviction exception did not apply and that the *Apprendi/Blakely* rule required the jury to make findings on this component. *Henderson*, 706 N.W.2d at 762.

In sum, the cases construing the prior conviction exception from the Supreme Court and from our court hold that the fact of recidivism does not have to be found by a jury in order to be used in sentencing. McFee contends, however, that his juvenile adjudications do not fall within the prior conviction exception because juvenile adjudications are not criminal convictions and because they do not come with a right to trial by jury. We analyze each of these issues in turn.

## II.

McFee characterizes his juvenile cases as "quasi-civil, non-criminal, rehabilitative adjudications." McFee and the dissent note that juvenile delinquents are not labeled "criminal[s]" and that juvenile adjudications are not to be deemed "conviction[s]" of crimes. Minn.Stat. § 260B.245, subd. 1(a) (2004).[6] These labels, however,

---

**6.** We note that the statute McFee and the dissent cite specifically provides that "an adjudication may later be used to determine a proper sentence." Minn.Stat. § 260B.245, subd. 1(a) (2004).

are not dispositive of the sentencing question. The Supreme Court has noted that when examining the juvenile justice system, courts are to "eschew 'the "civil" label-of-convenience which has been attached to juvenile proceedings.'" *Breed v. Jones,* 421 U.S. 519, 529, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975) (quoting *In re Gault,* 387 U.S. 1, 21, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)). Instead, the Court has directed that " 'the juvenile process ... be candidly appraised.'" *Id.* We turn to this appraisal.

The juvenile court system in Minnesota recently celebrated its 100–year anniversary. *See* Wright S. Walling & Stacia Walling Driver, *100 Years of Juvenile Court in Minnesota—A Historical Overview and Perspective,* 32 Wm. Mitchell L.Rev. 883 (2006). The system at its outset was premised on protection and rehabilitation of juveniles. *See Peterson v. McAuliffe,* 151 Minn. 467, 470, 187 N.W. 226, 227 (1922) (noting that Juvenile Court Act was "designed to secure the welfare of delinquent children, and not to punish them"); *see also* John M. Stuart & Amy K.R. Zaske, *What Does a "Juvenile Adjudication" Mean in Minnesota? Some Answers After a Century of Change in Juvenile Court,* 32 Wm. Mitchell L.Rev. 919, 923 (2006) (discussing *Peterson* ); Korine L. Larsen, Comment, *With Liberty and Juvenile Justice for All: Extending the Right to a Jury Trial to the Juvenile Courts,* 20 Wm. Mitchell L.Rev. 835, 867 (1994) ("The underlying purpose of the criminal justice system is punitive, whereas the juvenile justice system is intended to be helpful and rehabilitative.").

In part because of the rehabilitative goals of juvenile courts, the Supreme Court found that there was no federal constitutional right to a jury trial in juvenile court. *See McKeiver v. Pennsylvania,* 403 U.S. 528, 545, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (plurality opinion) (holding "that trial by jury in the juvenile court's adjudicative stage is not a constitutional requirement").[7] Although juvenile proceedings must have an emphasis on fair fact finding procedures similar to adult proceedings, such as rights to "notice, counsel, confrontation, cross-examination, and standard of proof," the Court determined that "one cannot say that in our legal system the jury is a necessary component of accurate fact finding." *Id.* at 543, 91 S.Ct. 1976. The Court also noted that use of juries in the juvenile justice system could operate to the juvenile's detriment because use of juries "will remake the juvenile proceeding into a fully adversary process and will put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding." *Id.* at 545, 91 S.Ct. 1976; *see also* Larsen, *supra,* at 855 (discussing *McKeiver* ).

Although the difference between the goals of the juvenile and criminal court systems was part of the reason for denying juveniles the right to jury trials in *McKeiver,* similarities between those two systems led the Court in other cases to apply other constitutional protections to juvenile court. *See* Barry C. Feld, *The Constitutional Tension Between* Apprendi *and* McKeiver: *Sentence Enhancements Based on Delinquency Convictions and the Quality of Justice in Juvenile Courts,* 38 Wake Forest L.Rev. 1111, 1140–43 (2003) (noting that similarities between criminal prosecutions and juvenile adjudications is what led Supreme Court to create procedural protections in *Winship* and *Gault* ). For example, in *In re Gault,* the Court held that juveniles were entitled to

---

7. This court has impliedly indicated its agreement with *McKeiver's* holding. *See In re* *K.A.A.,* 410 N.W.2d 836, 841 n. 9 (Minn. 1987).

due process protections that attach in criminal cases: specifically, the right to notice of charges, the right to counsel, the privilege against self-incrimination, and the right to confront and cross-examine witnesses. 387 U.S. at 33, 41, 55, 57, 87 S.Ct. 1428. Three years after *Gault,* the Supreme Court held that charges against juveniles must be proven by the same standard applicable to criminal cases: beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 368, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Then, in 1975, the Court held that double jeopardy protections apply to juvenile delinquency cases. *Breed,* 421 U.S. at 531, 95 S.Ct. 1779.

These cases reflect a change in thinking about the juvenile court system away from one premised solely upon rehabilitation. As one commentator notes, the Supreme Court in *Gault* "shift[ed] the formal focus of juvenile courts from 'real needs' to legal guilt." Barry C. Feld, *The Transformation of the Juvenile Court,* 75 Minn. L.Rev. 691, 695 (1991). Concerns over the juvenile crime rate also played a role in subsequent changes to the juvenile court system. *See* Stuart & Zaske, *supra,* at 924–26 ("Nationwide, the general trend in the past thirty years is toward stronger punishment and sentences for criminals, and away from rehabilitative ideals."); Larsen, *supra,* at 845–48 (discussing national and Minnesota trends).

The Minnesota Legislature made changes to the juvenile court system to reflect this shift in focus the commentators describe. Until 1980, the legislature's stated purpose for the juvenile court system was "to secure for each minor under the jurisdiction of the court the care and guidance * * * as will serve the spiritual, emotional, mental and physical welfare of the minor and the best interests of the state * * *." Juvenile Court Act of 1959, ch. 685, § 1, 1959 Minn. Laws 1275, 1275 (codified at Minn.Stat. § 260.011, subd. 2 (1978)). In 1980, the legislature expressed a new and separate purpose for the juvenile delinquency portion of the juvenile justice system: "The purpose of the law relating to children alleged or adjudicated to be delinquent is to promote the public safety and reduce juvenile delinquency by maintaining the integrity of the substantive law prohibiting certain behavior and by developing individual responsibility for lawful behavior." Act of Apr. 15, 1980, ch. 580, § 3, 1980 Minn. Laws 962, 966 (codified at Minn.Stat. § 260.011, subd. 2 (1998)).[8] This legislation reflects "a fundamental philosophical departure from the previous rehabilitative purpose of the juvenile justice system to much more explicitly punitive and social control purposes." Barry C. Feld, *Juvenile Court Legislative Reform and the Serious Young Offender: Dismantling the "Rehabilitative Ideal,"* 65 Minn. L.Rev. 167, 192 (1981); *see also* Stuart & Zaske, *supra,* at 927–28 (discussing change in purpose); Larsen, *supra,* at 848 (discussing change in purpose).[9]

In addition to the change in stated purpose, the legislature also changed how juvenile adjudications could be used. While

8. This stated purpose remains in the current version of the juvenile delinquency law. *See* Minn.Stat. § 260B.001, subd. 2 (2004).

9. No discussion of the changes in the juvenile justice system in Minnesota would be complete without a reference to the establishment of the EJJ prosecutions. This extension of juvenile court jurisdiction grew out of the work of the Minnesota Supreme Court Advisory Task Force on the Juvenile Justice System. *See* Stuart & Zaske, *supra,* at 940 (discussing task force and EJJ enactment); *see also* Minnesota Supreme Court Advisory Task Force on the Juvenile Justice System: Final Report, 20 Wm. Mitchell L.Rev. 595 (1994). Because McFee was not prosecuted within EJJ, we will not discuss EJJ further.

originally juvenile adjudications could not be used in any other proceeding, *see* Stuart & Zaske, *supra*, at 923 (discussing 1917 Juvenile Court Act), the legislature has now provided for use of juvenile adjudications as predicate offenses and as enhancements in a variety of criminal contexts. *See, e.g.,* Minn.Stat. § 169A.03, subd. 20 (2004) (including prior juvenile adjudications in the definition of a "prior impaired driving conviction" for purposes of driving while impaired laws); Minn.Stat. § 169A.54, subd. 3 (2004) (stating that juvenile adjudications are offenses for purposes of determining administrative penalties); Minn.Stat. § 243.166, subd. 1b (Supp.2005) (requiring adjudicated delinquents to register as predatory offenders); Minn.Stat. § 609.224, subds. 2, 4 (2004) (enhancing fifth-degree assault to gross misdemeanor or felony based on previous adjudications of delinquency); Minn.Stat. § 609.2242, subds. 2, 4 (2004) (enhancing domestic assault to gross misdemeanor or felony based on previous adjudications of delinquency); Minn.Stat. § 609.377, subd. 3 (2004) (enhancing malicious punishment of a child to a felony based on previous adjudications of delinquency); Minn.Stat. § 624.713, subd. 1(b) (2004) (making persons adjudicated delinquent for a crime of violence ineligible to possess a firearm); Minn.Stat. § 609.749, subd. 4 (2004) (enhancing harassment to a felony based on previous adjudications of delinquency); *see also* Stuart & Zaske, *supra*, at 922 (discussing use of juvenile adjudications in criminal contexts).

Finally with respect to legislative intent, the Sentencing Guidelines provide for the use of certain prior juvenile adjudications when calculating a criminal history score. Minn. Sent. Guidelines II.B.4. The legislature may modify the Guidelines, but it has taken no action to cast doubt on the Guidelines' inclusion of certain juvenile adjudications within the criminal history score. *See* Minn.Stat. § 244.09, subd. 11 (2004) (noting that modifications to the Guidelines shall be submitted annually to the legislature and that such modifications "shall be effective * * * unless the legislature by law provides otherwise").

As commentators have noted, the enactments discussed above "exemplified the legislative change from a primarily rehabilitative model of juvenile justice to a more punitive system that was aimed at stopping career criminals in the making." Stuart & Zaske, *supra*, at 928.[10] Notwithstanding this shift away from a rehabilitative model, McFee contends that "equat[ing]" juvenile adjudication "with criminal convictions for Sixth Amendment purposes would violate the purposes behind the juvenile justice system." We disagree.

Our own jurisprudence has recognized that it is appropriate to consider prior criminal behavior committed by juvenile offenders when those offenders appear before the criminal court for sentencing as adults. The dissent's contention that "McFee's juvenile adjudications * * * do not fit into the traditional basis for increasing a sentence" cannot be squared with our precedent. Before the establishment of the Guidelines, we saw "nothing improper" when the district court took a juvenile's prior record into account when imposing sentence. *State v. Johnson,* 299 Minn. 143, 148, 216 N.W.2d 904, 907–08 (1974). We have also approved the use of a defendant's prior juvenile record in calculating his criminal history score under the Guidelines. *State v. Peterson,* 331

10. The dissent's focus on a rehabilitative goal for the juvenile justice system is inconsistent with the developments outlined above.

N.W.2d 483, 484 (Minn.1983) (holding that "it was not error" for district court to "assign defendant one point for his juvenile record" when calculating his criminal history score); *see also Jackson v. State,* 329 N.W.2d 66, 67 (Minn.1983) (noting that defendant's long juvenile record could be used as a basis for dispositional departure under the Guidelines).[11]

The dissent argues that "[t]he distinction between juvenile court proceedings and criminal trials is supposed to work to the child's benefit." That may be true in the abstract, but in this case, the goal the juvenile court had for McFee was not realized—he chose to continue to engage in felonious behavior on multiple occasions. The question presented here is whether his choice to recidivate is relevant to his sentence. We believe, as we have said before, that such behavior, even though committed by a juvenile, is appropriately considered when sentencing the offender as an adult. *See Peterson,* 331 N.W.2d at

484; *Jackson,* 329 N.W.2d at 67; *Johnson,* 299 Minn. at 148, 216 N.W.2d at 908.[12]

■ Absent clear direction from the United States Supreme Court, we will not upset our precedent upholding the use of juvenile criminal behavior in sentencing and the carefully-balanced approach the legislature ratified in the Guidelines for use of juvenile adjudications in calculating criminal history score. In sum, we hold that it is not inconsistent with the legislature's purpose in maintaining the juvenile justice system for sentencing courts to use prior juvenile adjudications in calculating criminal history under the Minnesota Sentencing Guidelines.

### III.

■ Separate from his argument based on the nature of juvenile adjudications, McFee argues that his juvenile adjudications cannot fall within the prior conviction exception because they do not come with a right to a jury trial. While the United

---

11. The court of appeals also has determined that the use of juvenile adjudications to compute a defendant's criminal history score does not violate the defendant's due process or equal protection rights. *State v. Little,* 423 N.W.2d 722, 724–25 (Minn.App.1988), *rev. denied* (Minn. July 6, 1988).

12. At the same time we note that juvenile felonious behavior is not treated the same under our system as adult behavior. The Minnesota Sentencing Guidelines reflect a balanced policy judgment to include certain prior juvenile adjudications in a defendant's criminal history score. Under the Guidelines, juvenile adjudications are counted in calculating criminal history score if the conduct would have been a felony had the offender been an adult at the time the offense was committed. Minn. Sent. Guidelines II.B.4. Juvenile offenses are not counted the same as felony convictions. *Id.* Juvenile adjudications are counted only if the offender was over 14 years old at the time of the offense and is less than 25 years old at the time of felony sentencing. *Id.* Two such juvenile adjudications are needed to accumulate one

point and "generally, an offender may not receive more than one point on the basis of prior juvenile offenses." *Id.* cmt. II.B.405.

The commentary to the Guidelines notes that the Guidelines Commission conducted "several public hearings devoted to the issue of using juvenile records in the criminal history index." *Id.* cmt. II.B.401. The result of those hearings was a balanced approach that takes into account prior felonious behavior to a more limited extent than if the offender were tried as an adult. *See State v. Torgerson,* 329 N.W.2d 63, 65 (Minn.1983) (noting the intent of the Guidelines "to allow use of a defendant's juvenile record in determining his criminal history score only if the defendant has twice been through the juvenile court system and twice been adjudicated delinquent"). As noted by the Kansas Supreme Court when addressing this issue, "[i]t is difficult to justify upending the [Guidelines] without an unmistakable mandate from the United States Supreme Court." *State v. Hitt,* 273 Kan. 224, 42 P.3d 732, 740 (2002).

States Supreme Court has not decided this question, the majority of courts that have addressed the issue we face here have held that juvenile adjudications fall within the prior conviction exception.[13]

These cases focus on reliability and due process concerns, and conclude that the prior conviction exception applies, not because the defendant had a right to a jury trial in the prior proceeding, but because the prior proceeding met all due process requirements that attached to that proceeding. Ultimately, according to the majority, "the question of whether juvenile adjudications should be exempt from *Apprendi's* general rule should not turn on the narrow parsing of words, but on an examination of whether juvenile adjudications, like adult convictions, are so reliable that due process of law is not offended by such an exemption." *United States v. Smalley,* 294 F.3d 1030, 1032–33 (8th Cir. 2002). These courts have held that such adjudications satisfy the due process inquiry. The conclusion has rested in part on *McKeiver's* recognition that "use of a jury in the juvenile context would 'not strengthen greatly, if at all, the fact-finding function' and is not constitutionally required." *Smalley,* 294 F.3d at 1033 (quoting *McKeiver,* 403 U.S. at 547, 91 S.Ct. 1976). As the Eleventh Circuit Court of Appeals noted, "[j]uvenile adjudications, where juvenile defendants have the right to notice, the right to counsel, the right to confront and cross-examine witnesses, the privilege against self-incrimination, and the right to a finding of guilty beyond a reasonable doubt, provide more than sufficient safeguards to ensure the reliability that *Apprendi* requires * * *." *United States v. Burge,* 407 F.3d 1183, 1190 (11th Cir.2005) (citation omitted).

■ The supreme courts in Kansas and Indiana have concluded that the reliability and due process analysis in the Eighth, Third and Eleventh Circuits is persuasive. *See State v. Hitt,* 273 Kan. 224, 42 P.3d 732, 740 (2002) ("The *Apprendi* Court spoke in general terms of the procedural safeguards attached to a prior conviction. It did not specify *all* procedural safeguards nor did it require certain *crucial* procedural safeguards."); *Ryle v. State,* 842 N.E.2d 320, 323 (Ind.2005) ("The [Supreme Court's] main concern was whether the prior conviction's procedural safeguards ensured a reliable result, not that there had to be a right to a jury trial."). Three separate reasons lead us also to adopt the conclusion reached in these cases.[14]

First, McFee received all of the protections to which he was constitutionally entitled when he was adjudicated delinquent. It is true that McFee did not receive a jury trial in the juvenile cases at issue. *See* Minn.Stat. § 260B.163, subd. 1 (2004) ("[H]earings on any matter shall be without a jury * * *."). But McFee does not

---

13. *See, e.g., United States v. Burge,* 407 F.3d 1183, 1190 (11th Cir.2005); *United States v. Jones,* 332 F.3d 688, 696 (3d Cir.2003); *United States v. Smalley,* 294 F.3d 1030, 1032–33 (8th Cir.2002); *Nichols v. State,* 910 So.2d 863, 865 (Fla.Ct.App.2005); *Ryle v. State,* 842 N.E.2d 320, 322 (Ind.2005); *State v. Hitt,* 273 Kan. 224, 42 P.3d 732, 740 (2002); *State v. Deters,* 163 Ohio App.3d 157, 837 N.E.2d 381, 385 (2005), *rev'd in part on other grounds sub nom. In re Ohio Criminal Sentencing Statutes Cases,* 109 Ohio St.3d 313, 847 N.E.2d 1174, 1178 (2006); *State v. Mounts,* 130 Wash.App. 219, 122 P.3d 745, 747 (2005). There is authority to the contrary. *See United States v. Tighe,* 266 F.3d 1187, 1194 (9th Cir.2001); *State v. Harris,* 339 Or. 157, 118 P.3d 236, 246 (2005); *State v. Brown,* 879 So.2d 1276, 1289–90 (La.2004).

14. Given the great weight of the authority in support of this result, we do not agree with the dissent's characterization of the result reached here as somehow creating a "new rule."

dispute that he received all the process and protections that were due to him in connection with his juvenile cases.[15] It is illogical to say that a defendant is entitled to more process when the prior felonious behavior is used to increase a sentence than when the decision is made as to whether the felonious behavior occurred in the first instance. *Hitt,* 42 P.3d at 739 ("If juvenile adjudications are constitutionally sound according to the more limited set of rights afforded in juvenile proceedings, they may be used to increase a defendant's sentence for a later crime."); *United States v. Tighe,* 266 F.3d 1187, 1200 (9th Cir.2001) (Brunetti, J., dissenting) ("[W]hen a juvenile receives all the process constitutionally due at the juvenile stage, there is no *constitutional* problem (on which *Apprendi* focused) in using that adjudication to support a later sentencing enhancement.").

The dissent suggests that the prior conviction exception *depends* on a jury trial right and that therefore McFee's juvenile adjudications cannot fall within the exception. The cases the dissent cites, including our decision in *Allen,* cannot be read to support the broad reading the dissent gives them. Those cases involved prior convictions that the constitution clothed with a jury trial right. Juvenile adjudications, by contrast, have no such constitutional right. *See McKeiver,* 403 U.S. at 547, 91 S.Ct. 1976. We do not believe the

discussion of the jury function in those cases can be imported to situations like the one we face here where the defendant had no right to ask that a jury determine whether the unlawful behavior occurred in the first instance. As the Eighth Circuit noted, "[w]e think that while the Court established what constitutes sufficient procedural safeguards (a right to jury trial and proof beyond a reasonable doubt), and what does not (judge-made findings under a lesser standard of proof), the Court did not take a position on possibilities that lie in between these two poles." *Smalley,* 294 F.3d at 1032. This case presents that "in between" question. Because McFee received all of the process he was due in the juvenile cases, we believe those adjudications fall within the prior conviction exception.

Second, the role for a jury would be extremely limited in this context. McFee does not contend that he would be able to relitigate the issues determined in the juvenile cases in adult criminal court. He plainly could not use subsequent criminal proceedings to collaterally attack the validity of the juvenile court's adjudications. *Cf. State v. Cook,* 275 Minn. 571, 572, 148 N.W.2d 368, 369 (1967) (noting that a defendant cannot collaterally attack an administrative order suspending his license in a criminal appeal arising from his conviction for driving after suspension of his drivers' license).[16]

---

**15.** The dissent argues that we are "expressing a variant of Justice Breyer's dissenting argument in *Apprendi* [that was] rejected by the Court * * *." We disagree. Justice Breyer spoke in his dissent about "procedural compromises." 530 U.S. at 555, 120 S.Ct. 2348. There is no compromise here as McFee received all of the procedural protections to which the constitution entitled him in connection with his juvenile adjudications.

**16.** We have limited collateral attack of underlying convictions sought to be used as sen-

tencing enhancements to " 'unique cases.' " *State v. Warren,* 419 N.W.2d 795, 798 (Minn. 1988) (quoting *State v. Edmison,* 379 N.W.2d 85, 86 (Minn.1985)). An example was presented in *State v. Nordstrom,* 331 N.W.2d 901, 905 (Minn.1983), where the defendant claimed that he pleaded guilty without the requisite waiver of his right to counsel. *See also Pilger v. State,* 337 N.W.2d 695, 698 (Minn.1983) (refusing to permit the defendant to collaterally attack a North Dakota conviction which the state sought to use in determining his criminal history score).

Rather, McFee contends that the jury would simply verify the fact of the existence of the juvenile court adjudication, and the fact of the adjudication would be proven (or disproven) through use of documentary evidence of the adjudication. As we noted in *Allen*, this type of review is properly performed by the district court without need of jury fact finding. 706 N.W.2d at 48 ("Like the fact or character of a prior conviction, a defendant's custody status can be determined by reviewing court records relating to that conviction.").[17] A "comparison or weighing of bad conduct" is not required to determine whether a defendant has a juvenile record. *See Henderson*, 706 N.W.2d at 762; *cf. Shepard v. United States*, 544 U.S. 13, 25, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (holding that because the "disputed fact" was "too far removed from the conclusive significance of a prior judicial record," jury fact finding was required). Just as with the fact of probation, there is no need for a qualitative assessment of behavior when determining whether in fact the defendant was adjudicated delinquent. Accordingly, this situation is different from those cases where the jury is called on to examine some aspect of the underlying criminal behavior at issue in the case in which the court is imposing sentence. *See Shattuck*,

704 N.W.2d at 142 (holding that a jury, rather than a court, must find aggravating factors in the commission of an offense); *see also State v. Barker*, 705 N.W.2d 768, 773 (Minn.2005) (holding that facts underlying sentencing under Minn.Stat. § 609.11 for possession or use of firearm in the commission of an offense must be found by the jury).

Third, a defendant's prior juvenile record is relevant to recidivism, and, as discussed above, recidivism is the foundation on which the prior conviction exception was created.[18] Using prior felonious behavior adjudicated as delinquent in the juvenile system to increase a recidivist's sentence serves the legislature's articulated purposes in maintaining the juvenile delinquency court system, "promot[ing] public safety" and "developing individual responsibility for lawful behavior." Minn. Stat. § 260B.001, subd. 2 (2004). Nothing about the circumstances of the offense for which sentence is being imposed is at issue when the question is recidivism. *See Burge*, 407 F.3d at 1189 (relying on *Apprendi's* conclusion that "recidivism 'does not relate to the commission of the offense itself'" (quoting *Apprendi*, 530 U.S. at 496, 120 S.Ct. 2348)).[19] For recidivism purposes, the only question is whether the

---

17. Similarly, verifying that the defendant was over 14 years old at the time of the juvenile offense and less than 25 years old at the time of adult sentencing, as required for use of adjudications under the Guidelines, *see* Minn. Sent. Guidelines II.B.4, can easily be done through examination of court records.

18. The Guidelines include the juvenile record within the criminal history score to provide information about the very fact of recidivism. *See* Minn. Sent. Guidelines cmt. II.B.401 ("The juvenile history item is included in the criminal history index to identify those young adult felons whose criminal careers were preceded by repeated felony-type offenses committed as a juvenile.").

19. The dissent states that the result reached here "significantly expands *Apprendi's* prior conviction exception in a way that is completely at odds with the Supreme Court's unwavering commitment to a narrow definition of a prior conviction." We disagree. As noted above, the Supreme Court has not addressed the question before us. The Court has said, however, that the basis for the prior conviction exception is recidivism. *Jones*, 526 U.S. at 249, 119 S.Ct. 1215; *cf. Henderson*, 706 N.W.2d at 762. The result reached here simply holds McFee accountable for his recidivism. We believe this result is entirely consistent with the Supreme Court's formulation of the prior conviction exception.

defendant was in fact adjudicated guilty of the prior conduct. As we have said, "a defendant's proclivity for recidivism * * * is often the critical factor" in sentencing. *City of St. Paul v. Froysland,* 310 Minn. 268, 275, 246 N.W.2d 435, 439 (1976). We believe, as the Supreme Court suggested in *Jones,* that recidivism is "distinguishable for constitutional purposes from other facts that might extend the range of possible sentencing." 526 U.S. at 249, 119 S.Ct. 1215. As long as the recidivist received all of the process that was due to him in the prior proceeding, the constitution does not require that a jury separately verify the fact of his prior adjudication.

We hold that, in calculating a defendant's criminal history score, a defendant does not have a Sixth Amendment right to a jury determination of the fact of a prior juvenile adjudication.

Affirmed.

MEYER, Justice (dissenting).

### DISSENT

I respectfully dissent. The district court used three adjudications of juvenile delinquency to increase McFee's sentence beyond what would otherwise be authorized by the jury verdict or guilty plea alone. I would conclude that the use of juvenile adjudications to enhance McFee's sentence violates his rights under the Sixth Amendment because juvenile adjudications do not fit into the "prior conviction exception" of *Apprendi v. New Jersey* and *Blakely v. Washington.*

The central question in this case is the meaning of the "prior conviction exception" as articulated by the United States Supreme Court and our court. The Supreme Court has made it clear that " 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved

beyond a reasonable doubt.' " *Blakely v. Washington,* 542 U.S. 296, 301, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) (quoting *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)). The only exception to this rule is the "fact of a prior conviction." *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348.

The prior conviction exception to the *Apprendi* rule arose out of the Supreme Court's earlier decision in *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). In *Almendarez–Torres,* the Court upheld a defendant's sentence that had been increased because the defendant had admitted in his guilty plea that he had three prior convictions. *Id.* at 226–27, 248, 118 S.Ct. 1219. The Court held that because of " 'the distinct nature of the issue,' " *id.* at 244, 118 S.Ct. 1219 (quoting *Graham v. West Virginia,* 224 U.S. 616, 629, 32 S.Ct. 583, 56 L.Ed. 917 (1912)), that issue being recidivism, and because recidivism "is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence," *id.* at 243, 118 S.Ct. 1219, the fact of the defendant's prior felony convictions did not have to be proven to a jury beyond a reasonable doubt. *Id.* at 247, 118 S.Ct. 1219.

The next year, the Supreme Court explained that *Almendarez–Torres* dealt with a very narrow fact question and described why prior convictions did not have to be submitted to a jury: "[U]nlike virtually any other consideration used to enlarge the possible penalty for an offense, * * * *a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees.*" *Jones v. United States,* 526 U.S. 227, 249, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) (emphasis added).

In *Apprendi,* decided one term later, the Supreme Court stated that the prior con-

viction exception is "a narrow exception to the general rule" and "represents at best an exceptional departure from the historic practice that [a defendant has a right to a jury determination of any fact that increases the penalty for a crime beyond the statutory maximum]." *Apprendi,* 530 U.S. at 487, 490, 120 S.Ct. 2348. *Apprendi* iterated the Court's explanation in *Jones* that "the certainty that procedural safeguards attached to any 'fact' of prior conviction" justified the exception. *Id.* at 488, 120 S.Ct. 2348.

Our court has endorsed the Supreme Court's narrow exception to *Apprendi.* We have stated in plain terms that "[t]he primary reason for excluding a prior conviction from the constitutional rule is that the prior conviction itself has been established by procedures that satisfy constitutional *jury-trial* and reasonable-doubt guarantees." *State v. Allen,* 706 N.W.2d 40, 47 (Minn.2005) (emphasis added). Thus, the narrow prior conviction exception exists because, among other procedural safeguards, the defendant had a right to a jury trial in the prior proceeding.

In this case, the use of McFee's prior adult criminal activity was constitutional; the existence of those convictions did not have to be submitted to a jury because a jury trial right had attached to them and because they fit into the traditional basis for increasing a sentence. McFee's juvenile adjudications, in contrast, had no jury trial right attached to them and as quasi-civil, rehabilitative adjudications, they do not fit into the traditional basis for increasing a sentence. Juvenile adjudications do not fit into the prior conviction exception.

Minnesota law plainly defines juvenile adjudications as fundamentally different from convictions. Our law provides that "[no] child [shall] be deemed criminal by reason of [a delinquency] adjudication, *nor shall th[e ] adjudication be deemed a con-*

*viction of crime."* Minn.Stat. § 260B.245, subd. 1 (2002) (emphasis added). Juvenile adjudications are not crimes and juveniles do not serve sentences. The goal of juvenile court is to rehabilitate the child. *See* Minn.Stat. § 260B.198, subd. 1 (2002). By treating and rehabilitating children, the state is relieved of the responsibility to give children the right to a jury trial. *See McKeiver v. Pennsylvania,* 403 U.S. 528, 545, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (holding that juvenile court proceedings are not criminal prosecutions under the Sixth Amendment and the jury trial right does not attach). The distinction between juvenile court proceedings and criminal trials is supposed to work to the child's benefit. *See McKeiver,* 403 U.S. at 547, 91 S.Ct. 1976 (requiring jury trials would inhibit the ability of juvenile courts to effectively carry out their rehabilitative role).

The majority asserts that cases and commentators have signaled a "change in thinking about the juvenile court system away from one premised solely upon rehabilitation." In particular, the majority asserts that certain legislative action has "changed how juvenile adjudications could be used." If what the majority suggests is true, that juvenile court is now more focused on punishment than rehabilitation and juvenile adjudications are more akin to convictions than they used to be, then it brings into serious question the vitality of *McKeiver's* fundamental principle that the rehabilitation model for juvenile court justifies the denial of the right to a trial by jury. If juvenile adjudications are akin to convictions, then it follows that they are entitled to *all* of the procedural protections that accompany such a classification. As the Louisiana Supreme Court wrote: "If a juvenile adjudication, with its lack of a right to a jury trial which is afforded adult criminals, can then be [used to enhance an adult sentence] the same as a felony con-

viction * * * then 'the entire claim of parens patriae becomes a hypocritical mockery.'" *State v. Brown,* 879 So.2d 1276, 1289 (La.2004) (citation omitted). Either we install jury trials in juvenile courts if the disposition is primarily punitive rather than rehabilitative, or we reaffirm the principles of rehabilitation in juvenile court and continue the distinction between juvenile adjudications and adult criminal convictions.

The majority's new rule significantly expands *Apprendi's* prior conviction exception in a way that is completely at odds with the Supreme Court's unwavering commitment to a narrow definition of a prior conviction. The majority's new rule is that prior juvenile delinquency adjudication may be used to increase a defendant's sentence for a later crime because the fact of a juvenile adjudication, like an adult conviction, is so "reliable" that due process of law is not violated. The majority essentially concludes that because a judge can "reliably" determine the fact of a juvenile adjudication, and because the juvenile adjudications "met all due process requirements that attached to that proceeding," McFee does not have a Sixth Amendment right to a jury determination of the facts that increased his prison sentence. The majority borrows this "reliability" test from various courts around the country.

The first federal appeals court to consider the precise issue in this case was the Ninth Circuit Court of Appeals in *United States v. Tighe,* 266 F.3d 1187, 1194 (9th Cir.2001). That court held that juvenile adjudications "do not fall within *Apprendi's* 'prior conviction' exception" for the reason that the right to a jury trial was integral to the exception. *Id.* (holding that the prior conviction exception "was premised on sentence-enhancing prior convictions being the product of proceedings that

afford crucial procedural protections—particularly the right to a jury trial and proof beyond a reasonable doubt"). The Ninth Circuit indicated that a contrary holding would have been an extension of the Supreme Court's holding in *Almendarez–Torres,* and that language from *Apprendi* counseled against making such an extension. *Tighe,* 266 F.3d at 1194 (quoting *Apprendi,* 530 U.S. at 489–90, 120 S.Ct. 2348).[1]

State supreme courts are equally divided on whether the prior conviction exception should be extended to juvenile adjudications. *Compare State v. Harris,* 339 Or. 157, 118 P.3d 236, 246 (2005) (holding "the Sixth Amendment requires that when [a juvenile] adjudication is offered as an enhancement factor to increase a criminal sentence, its existence must either be proved to a trier of fact or be admitted by a defendant for sentencing purposes following an informed and knowing waiver"), *and State v. Brown,* 879 So.2d 1276, 1289 (La.2004) (holding that a juvenile "adjudication should not be counted as a 'prior conviction' for *Apprendi* purposes"), *with Ryle v. State,* 842 N.E.2d 320, 323 (Ind. 2005) (holding that juvenile adjudications are prior convictions for purposes of *Apprendi* rule and indicating that "[t]he main concern was whether the prior conviction's procedural safeguards ensured a reliable result, not that there had to be a right to a jury trial"), *and State v. Hitt,* 273 Kan. 224, 42 P.3d 732, 740 (2002) ("Juvenile adjudications are included within the historical cloak of recidivism and enjoy ample procedural safeguards; therefore, the *Apprendi* exception for prior convictions encompasses juvenile adjudications."). Both the Indiana and Kansas Supreme Courts appear to have based their decisions, at least in part, on their belief that an oppo-

---

1. As the majority notes, other circuit courts have not followed *Tighe's* lead.

site ruling would result in a large number of appealed sentences. *See Ryle,* 842 N.E.2d at 323 ("A decision to require the jury to determine the 'fact' of prior juvenile adjudications would result in an untold number of defendants clogging the trial courts on remand * * *."); *Hitt,* 42 P.3d at 740 ("To remove juvenile adjudications from the [guideline] calculation would require the resentencing of many and result in lighter sentences for them and future defendants."). These concerns have no legitimate place in an inquiry into whether a defendant's Sixth Amendment rights have been violated.

In each of the cases relied on by the majority in which a court determined that juvenile adjudications fit within the prior conviction exception, the opinions expressly or implicitly held that the jury trial "circuitbreaker in the State's machinery of justice" is *not* integral to the prior conviction exception. *See Blakely,* 542 U.S. at 306, 124 S.Ct. 2531. Those opinions arrived at that conclusion even though the Supreme Court has indicated that the prior conviction exception depended upon the satisfaction of the jury trial guarantee in the prior proceeding. *Jones,* 526 U.S. at 249, 119 S.Ct. 1215. In my view, it simply does not matter that an enhancement fact could be "reliably" determined by a judge; unless the fact is a prior conviction, the Sixth Amendment gives a defendant the right to demand a jury to find such a fact. *See Blakely,* 542 U.S. at 304, 124 S.Ct. 2531 ("When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, and the judge exceeds his proper authority." (internal citation and quotation marks

omitted)). In concluding otherwise, the majority is expressing a variant of Justice Steven Breyer's dissenting argument in *Apprendi,* rejected by the Court, that the proper inquiry is whether the procedures employed by the court result in a "fair functioning of the criminal justice system." *See* 530 U.S. at 555, 120 S.Ct. 2348 (Breyer, J., dissenting).

The proper inquiry under *Apprendi* is not whether McFee's juvenile adjudications were "fairly" or "reliably" determined. The proper inquiry is whether the fact of McFee's prior juvenile adjudications was ever determined by a jury. *See Apprendi,* 530 U.S. at 498–99, 120 S.Ct. 2348 (Scalia, J., concurring) ("What ultimately demolishes the case for the dissenters is that they are unable to say what the right to trial by jury *does* guarantee if, as they assert, it does not guarantee—what it has been assumed to guarantee throughout our history—the right to have a jury determine those facts that determine the maximum sentence the law allows."). I see no reason to conclude, given the Supreme Court's emphatic pronouncements on the separate importance of the right to a jury trial, that the Court did not mean to limit the prior conviction exception to prior proceedings "satisfying the fair notice, reasonable doubt, and jury trial guarantees." *Jones,* 526 U.S. at 249, 119 S.Ct. 1215.[2]

Although the right to a jury trial provides fact reliability and due process guarantees, the "right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure." *Blakely,* 542 U.S. at 305–06, 124 S.Ct. 2531. As the Court said in *Shepard v. United States,* "the Sixth and Fourteenth

---

**2.** *See also Apprendi,* 530 U.S. at 496, 120 S.Ct. 2348 ("[T]here is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof.").

Amendments guarantee a jury standing between a defendant and the power of the state, and they guarantee a jury's finding of any disputed fact essential to increase the ceiling of a potential sentence." 544 U.S. 13, 25, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005). That is, the jury trial right is not primarily focused on the reliability of the jury's conclusions drawn from the facts, but rather on preventing the state from drawing conclusions from the facts without using a jury.[3]

In summary, because a juvenile adjudication is not "the fact of a prior conviction," it cannot be used to increase a defendant's sentence beyond that otherwise authorized. I would reverse and remand for resentencing.

ANDERSON, PAUL H., Justice (dissenting).

I join in the dissent of Justice Meyer.

---

3. The majority attempts to buttress its conclusions by noting that "the role for a jury would be extremely limited in" determining the fact of prior juvenile adjudications. In so doing, the majority presumes away the concern that motivated the adoption of the jury trial right in the first place—democratic control over a potentially corruptible judiciary. *See Blakely,* 542 U.S. at 306, 124 S.Ct. 2531 ("Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary.").